FILED

2010 NOV 29  P 12: 50

U.S. DISTRICT COURT
BRIDGEPORT, CONN

# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

## APPLICATION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2254
## BY A PERSON IN STATE CUSTODY

### 3:10CV410 (MRK)

## OBJECTION TO RESPONDENT'S

## MOTION TO DISMISS

*Randall B. Saunders #253100*
*v.*
*Commissioner, Department of Correction*

**November 2010**

Randall B. Saunders
289 Shaker Road
P.O. Box 1500
Enfield, CT 06082

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

RANDALL B. SAUNDERS                    :                    3:10CV410 (MRK)

      v.                                        :

COMMISSIONER,                          :
DEPARTMENT OF CORRECTION               :                    November 22, 2010

### OBJECTION TO RESPONDENT'S MOTION TO DISMISS

The petitioner, Randall B. Saunders, respectfully objects to the respondent's motion to dismiss

his habeas corpus matter in its entirety and submits this memorandum in support thereof.

The respondent in its first eight and one half pages of its brief claim that relief is not available

because Saunders failed to exhaust his state remedies.

The respondent's premise in that a petitioner must exhaust state's remedies is accurate but their

conclusions to this action are initially inapposite and collaterally misapplied.

Saunders in his brief to "excuse the exhaustion requirement" relies on a gateway claim of actual

innocence (brief at 102-103). Saunders further seeks review claiming circumstances exist

that render state process ineffective pursuant to 28 U.S.C. § 2254 (B) (1) (B) (ii).

Saunders claims this gateway exception includes, as it must, a claim of actual innocence.

Since Saunders arrest on January 27, 1997 he has maintained he acted in self-defense.  After a

hung jury on the charge of murder, the state charged Saunders with intentional manslaughter in

the first degree with a firearm under C.G.S. § 53a-55a (1).

Fourteen days prior to the commencement of trial on that charge, the state by way of substitute

long form information charged Saunders with 2 subsections of manslaughter "conjunctively",

single count information, alternative methods of committing manslaughter in the first degree

1

with a firearm.[1] (Also, see brief in binder 2 of 2, pages 34-49.)

With a patently unconstitutional charging instrument and an impermissible jury instruction which included "just decide one" and "your deliberations end once you reach a guilty verdict", the jury unanimously found Saunders not guilty of manslaughter in the first degree with a firearm, however, at the direction of the court continued to deliberate and found Saunders guilty of "reckless indifference manslaughter in the first degree" (at 33, binder 2 of 2).

The court accepted the guilty verdict and remained silent to the first verdict of not guilty. In this self-defense case the first unanimous verdict is dispositive of the entire criminal proceeding. Saunders is actually innocent by way of a unanimous jury verdict of not guilty.

The respondent at 9 advances her argument claiming circumstances in this case do not excuse the exhaustion requirement "at this time".

Saunders relies in his brief (at 104) on the procedural fact that a claim of actual innocence itself is not a constitutional claim, even existence of concededly meritorious constitutional violations, it is not itself sufficient to establish a miscarriage of justice exception. However, if the petitioner presents evidence so strong that the court cannot have confidence in the outcome unless the court is also satisfied that the trial was free of non-harmless error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claim. *Schlup v. Delo*, 115 S.Ct. 851, 63 U.S.L.W. 4089, 1995, S.Ct. 40424 at [42].

Accordingly, Saunders highlights "structural errors" in his brief (at 104-107). These errors as applied to Saunders cast so much doubt on the trial process that as a matter of law may never be considered harmless.

---

[1] All 3 subsections of manslaughter in the first degree with a firearm are separate crimes, NOT alternative methods of committing manslaughter in the first degree with a firearm.

Saunders then highlights at 107-108 the egregious pattern of prosecutorial misconduct under *Brecht* FN-9. This misconduct is also assimilated to structural error and declared to be incapable of redemption by actual prejudice analysis.

Because credible claims of actual innocence are "extremely rare" federal court adjudication of constitutional challenges by petitioners who may be actually innocent prevents miscarriage of justice, but does not threaten state interest in finality. *Schlup*, 513 U.S. (at 321-322)

Saunders also claims relief from exhaustion pursuant to § 2254 (B) (1) (B) (ii) in that certain circumstances exist that render such process ineffective to protect the rights of the applicant.

The respondent also states that in Saunders claim of actual innocence the court may only waive exhaustion if there is an absence of available state corrective process or circumstances exist that render such process ineffective to protect the rights of the applicant.

It is the respondent's position at 1 that the petitioner is currently pursuing ALL of his claims in state court.  The respondent repeats this claim on 12 additional occasions: at 6, 10, 12, 12, 13, 14, 14, 15, 18, 21, 21 and 24.  This claim is not based in fact.

After Saunders' state habeas trial he filed document #13 which is a reply to the state's objection to preserve relevant evidence. In that document dated August 6, 2010 Saunders made the court and the respondent aware that state appointed counsel has again precluded adjudication regarding all claims of ineffective assistance of counsel (counts 1-31), all ballistic challenges, and claims that the E-911 emergency transmissions has been criminally tampered with.

Attached to that document were letters instructing state appointed counsel whom to contact, questions to ask, as well as items to put into evidence. Habeas counsel effectively waived 46 of the 58 count habeas complaint.

The respondent's brief dated August 20, 2010 is 10 days after Saunders informed her of this extraordinary conduct of appointed counsel.  Despite the assertions of the state on 13 occasions throughout her brief, Saunders is not "contemporaneously adjudicating those exact same claims". A full and fair hearing [emphasis added] has not taken place and another inordinate delay has been created that can be fairly charged to the state.

The rule excusing exhaustion in cases of inordinate delay is not limited to delays caused by judges, court officials and prosecutors; it also has been applied to delays caused by court appointed counsel which may be attributable to the state as long as the petitioner has not personally caused or condone them. *Harris v. Champion*, 938 F.2d 1062-65 (10th cir. 1991).

In juxtaposition to the interference by officials, in Saunders' brief at 109-123 appointed counsel, H. Jeffrey Beck's actions are relevant and noteworthy.

The state habeas trial commenced on May 13-14, 2010, as well as August 5, 2010.  Beck was appointed as special public defender (appearance filed June 2, 2009) Beck had the case for one year and not once did he indicate to Saunders that his claims were without merit or that he had any intention not to try this case.

On May 10, 2010, 3 business days before trial, Beck filed for a continuance to allow him time to file an *Anders* brief.  Saunders received a letter that same day in which Beck has, after one year, adopted the misstatements of law the respondent currently relies. (see post-trial brief, ATTACHMENT 1)

This attempt to blindside Saunders was denied and Beck was forced to try the case. In document #13 (ATTACHMENT 2) are those letters and application to file an *Anders* brief. Exhibit A in that document contains the letters sent to Beck to guide him through the next scheduled state habeas trial date, August 5, 2010.  Beck never contacted Saunders or his power of attorney to

4

obtain any further exhibits or to inform Saunders of his trial strategy.

August 5, 2010 Beck never called either trial counsel thus waiving ineffective assistance of counsel claims counts 1-31.  Beck never called expert testimony regarding the 911 emergency transmissions, never asked prosecutor Murray any questions regarding that tape and Beck rested without any inquiry of ballistic or forensic allegations.

Another inordinate delay has been created. In order to reclaim the waived counts of ineffective assistance of counsel, Saunders will have to file another habeas claiming ineffective assistance of habeas counsel; this will take years and will result in either a new habeas trial or appeal.

The respondent's claim that appropriate recourse would be the Appellate Court is nonsensicle. If it is not in the record, it is not reviewable.

Further overview of Beck's actions is notable as there is an underlying burden in this case that compels state appointed counsel to take extraordinary measures to prevent a full and fair hearing of Saunders' claims. These acts can be fairly charged to the state.

Saunders respectfully directs the court to binder 2 of 2 in his pleadings.  At 78, lines 18-21, Saunders is making the court aware that he will require financial assistance with experts for the upcoming habeas trial.  Beck filed an appearance (at 180) immediately thereafter.

At the status conference of August 7, 2009 (at 186, lines 22-23) Beck stated:

"I've talked to him (Saunders) in detail and we are prepared to go with what he filed."

At 188 when Beck was asked the question "Is this going to be a one-day trial", Beck responded:

"I don't think so your honor because I know he has experts retained."

A scheduling order was made and Beck never met a single scheduling order.

At 195-202 Saunders tried to remove Beck as counsel, that motion was denied and

Saunders took exception; another year has gone by...

Six years have passed since the application for habeas relief, 9 years in prison with a unanimous not guilty verdict.

> The requirement to exhaust state remedies is not a jurisdictional limitation on the federal courts...rather a matter of comity between the federal and state courts, the forbearance of the federal courts is based on the assumption that state remedies available to the petitioner are adequate and effective to vindicate federal constitutional rights.  When state procedures become ineffective or inadequate, the foundation of the exhaustion requirement is undercut and federal courts may take action. *Shelton v. Heard*, 696 F.2d 1127, 1128 (5th cir 1983).

Also,

> We repeat that justice delayed is justice denied...we fully appreciate the requirement of comity but further deference to state courts would constitute a comity of errors making a mockery of fundamental rights that are guaranteed to the guilty and innocent alike, hence, we now hold that the egregious ongoing delay in amounting to 5 and one half years as a matter of law excused exhaustion in state remedies concerning all claims raised by the petitioner. *Burkett v. Cunningham*, 826 F.2d 1208, 1218, 8 Fed R. Serv. 3d 609 (3rd cir. 1989)

The respondent maintains that Saunders is responsible for these inordinate delays (respondent at 21):

> Much of the delays in processing the claims raised in this state/federal petition is attributed to the petitioner himself. The internet case summary for his underlying habeas action (respondent's appendix P) reveals that of 106 document entries, over 60 have been generated by the petitioner.

6

Also at 21,

> The state habeas court has repeatedly been [required to interrupt] the progression of
> the petitioner's case to review and or rule upon many filings generated by him.  He also
> sought interlocutory appellate review of trial court's denials as well as reconsideration of
> Appellate Court's rulings (see this motion and ruling at binder 2 of 2, 151-154). Finally,
> the hearing on November 6, 2008 revealed that the public defender's office has
> expended considerable funds copying the petitioner's entire criminal file and that took
> time to comply with the orders of his motions to accomplish that task.

These accusations offend rational thought and are factors that support consideration in the
court's decision to excuse exhaustion.

After attorney Bansley withdrew and abandoned this case (see binder 2 of 2, 204-209),
Saunders filed 81 motions to obtain exculpatory evidence.  The courts ordered all requested
evidence; however, the public defenders did not comply forcing Saunders to file motions to
compel, review, reconsider, and a writ of mandamus. Without success and despite rulings of
compliance, Saunders turned to the federal courts and filed a § 1983 civil action (see binder 2 of
2 at 110) in which relief requested was "named defendants comply with prior orders of
discovery". Denied.

It was the public defender's office that decided not to obtain the files from prior counsel and
"expend considerable funds" to provide Saunders with an alleged complete file.

Furthermore, the hearing of November 6, 2008 that the respondent basis her conclusion on was
a request to obtain work product in which Saunders was the rightful owner; specifically the 911
tapes that are enhanced and analyzed by his expert (see binder 2 of 2, 237-284).
Rather than turning these tapes over (which can only be played on a DAT machine) the state
public defenders chose to have alleged copies made.

7

During that laborious [emphasis added] hearing Saunders made it clear at 281, "I am looking for the original copy of the 911 emergency transmission recorded on 4-9-98." Counsel for the public defenders claims she turned them over.

Saunders respectfully directs the court to review pleadings binder 2 of 2 at 285-291. These are follow-up requests regarding the 911 tapes after that hearing.

In binder 2 of 2 at 291 is a copy of the tape that was supplied and claimed to be originally recorded on 4-9-98.This tape is merely a copy of other work product. This tape contains no verbal time-stamp as heard on state's exhibit 69 that is supplied to the court on pleadings' page 2 in binder 2 of 2.

Saunders informed the courts repeatedly that prior counsel placed the sole copy of the original 911 tape in a basket in some hallway and was never accounted for again (see affidavit in pleadings page at 128, binder 2 of 2).

The respondent further claims at 11 that the 911 tapes actually are in the possession and are the property of the Danbury fire department, a municipal agency, and the state's attorney office only had possession of copies of those tapes; this is also relevant to Saunders' claim.

The state's attorney in the prosecution of Saunders stated clearly and unequivocally in pre-trial discovery as to the whereabouts of that E-911 tape #26. In the transcripts of February 3, 1998:

> "The original and I believe it is an analog tape, is in existence
>
> and is in the possession of the state."

It has only been recently claimed by attorney Sulik, the respondent for the state, that the municipality of Danbury is now in possession of the tape and the court is without jurisdiction to obtain it (see binder 2 of 2 at 122).

The court has had a taste of this evasive quest in its request in ruling #14 that the respondent take possession of tape #26 and make it available. The respondent chose to keep the tape in its "safe haven" out of the reach of Saunders and the Court.

This evasive quest and has gone on since January 27, 1997.  The original tape has not been played in its original format in front of any trier of fact.

The respondent at 22 states:

> After November 2008 the petitioner never attempted to obtain the tapes for production in his habeas trial, nor did he subpoena the Danbury fire department to produce them at trial.

On December 8, 2008 Judge Santos (at 161, binder 2 of 2) appointed counsel.  After that Saunders had no control over his case. Attorney Beck was repeatedly advised to obtain tapes and experts but failed to do so. (see pages 192-194, binder 2 of 2)

The respondent further surmises the court should dismiss Saunders' application for relief and send him on another 13 year journey to retrieve exculpatory evidence.

**Further exhaustion of state remedies**

The respondent then relies on U.S.D.J. Chatigny reiterating the standard of review pertaining to the exhaustion in *Swain v. Murphy*, at 3:08CV1394 (March 26, 2010). The criteria in *Swain* is more supportive of Saunders' claims.

In *Swain* the court stated:

> In considering whether delay has rendered a state remedy ineffective a federal court will consider the status of the state's proceedings, quoting see *U.S. ex rel. Goodman v. Kehl*, 456 F.2d. 863 (2nd cir. 1972).

> Delay in processing a state habeas petition may be insufficient to justify dispensing with

the exhaustion requirement if a hearing has been held and a ruling has been issued. See *Cristin v. Brennan*, 281 F.3d 404, 411 (3rd cir.) 2002...the petitioner has not shown that the delay is fairly charged to the state, that he complained about delay to the state court or sought an expedited hearing, or that the delay has impaired his ability to prove his claims. More to the point, the state habeas proceeding has gone to trial and a decision has been issued on the merits.  When a previously stalled state habeas proceeding has come to light and progressed this far, it is appropriate for the federal court to give the state Appellate Court an opportunity to hear the claim in the first instance. See *Wallace v. Dragovich*, 143 Fed. Appx. 413, 418-19 (3rd cir.) 2005.

The respondent concludes with "[correspondingly] Saunders has proceeded through the state habeas court and a decision on the merits is pending with filing of post-trial briefs."

A) **In *Cristin v. Brennan* the petitioner has not shown that the delay he experienced is fairly charged to the state.**

The disparities between the two can't be more obvious. Saunders has filed 81 motions to bring his claims to judgment. All that is available to him within "available state remedies", (see case detail, respondent's appendix Q) and potential federal remedies (see § 1983 action, supra.).

Once attorney Beck was inserted over Saunders objection he didn't pursue any of the requested exculpatory evidence within Saunders motions.  The respondent's comment above implies Saunders has "gone through" a full and fair hearing.  This is simply not the case.

B) **That he complained about the delay to state court or sought an expedited hearing.**

Saunders sought 19 hearings, received orders for compliance when hearings were had, but respondents have not complied with orders of the court.  Motion for review from state Appellate Court instructs Saunders to go to trial without ordered discovery (at 154,

binder 2 of 2).

**C) The delay has impaired his ability to prove his claims.**

The state has made it painfully clear they are not going to produce the original 911 tape.

The request from this court in document #14 in which the court requested the

respondent (the state) take possession of the original resulted in another inordinate

delay.  The state's reason amounts to "lawyerly double speak".

"The petitioner has repeatedly [since before his first criminal trial] accused the division of

criminal justice of tampering with the 911 tapes, accordingly, because the potential for

further litigation with regard to that allegation, the office of the chief state's attorney

believes it is best that the Danbury fire department retain tapes until final adjudication of

that claim."

A rational thought would be to release those tapes to present to a trier of fact and

remove any question to their authenticity.

This tape is key evidence in this matter since its inception. The tape, state's 69, is

fabricated and withholding the original tape until "final adjudication" is unconscionable,

prevents a full and fair hearing and creates further inordinate delay. (see pages 1-31,

binder 2 of 2)

**D) The state habeas has gone to trial and a decision has been issued on the merits,**

**now it is appropriate to give the state Appellate Court an opportunity to hear the**

**claims in the first instant.**

As described above, once attorney Beck was inserted into Saunders case, he ambushed

Saunders with an attempt at an *Anders* brief and then intentionally misled Saunders in

believing he was going to prosecute this case accordingly. He subsequently waived all

counts concerning allegations regarding the authenticity of state's 69, the 911

11

emergency transmissions; and any appeal as the state suggests would be meaningless.

As stated above, the only recourse is another state habeas claiming ineffective assistance of habeas counsel. That would be followed by an appeal, or a new habeas trial, and the discovery chase starts again…

The review standards of *Swain* would reasonably conclude Saunders is entitled to excuse exhaustion and proceed in federal court on the merits of his claim.

The respondent further claims that all of Saunders federal claims are unexhausted. Exhaustion requires petitioner to fairly present his federal claims in a state court. *Jones v. Keane*, 329 F.3d 290, 294-95 (2nd cir. 2003).

Their specific claim lies within counts 29-30.  In their brief they contend the double jeopardy claim was not presented as a sixth amendment violation of the right to effective assistance of counsel (count 29).

The subject matter in count 29 is a controversy created by the state Supreme Court based on their own finding of fact in *State v. Saunders*, 267 Conn. 363, 838 A.2d 186 (2004).

At [84]:

Relying primarily on this courts holding in *State v. Tate*, 256 Conn. 262 (2001), the defendant claims that his second trial violated the double jeopardy clause because the trial court declared a mistrial without the requisite manifest necessity.

In *Tate* we held that a manifest necessity did not exist for the trial court's declaration of a mistrial without consent of the defendant James Tate.

We concluded that because the trial court declined to poll the jury in accordance with Tate's request, it failed to explore all reasonable alternatives to the declaration of a mistrial.  In the present case we conclude that because the defendant consented to the declaration of a mistrial, he cannot prevail on his claim that his second trial was barred

12

by double jeopardy.

At [85]:

It is clear from the record that the defendant did not expressly object to the declaration of mistrial.

The high court concludes that:

The determinative issue is whether the defendant may be deemed to have consented to the trial court's declaration of mistrial.

This dispute is not based in fact.

The court's decision is supported and interwoven with federal law which is consequently misapplied. *United States v. Gantley*, 172 F.3d 422, 429 (6th cir. 1999), *United States v. Buljubasic*, 808 F.2d 1260, 1265-66 (7th cir), cert. denied, 484 U.S. 815, 108 S. Ct 67, 98 L. Ed. 2d 31 (1987), *United States v. DiPietro*, 936 F.2d 6, 11 (1st cir. 1991) *United States v. Palmer*, 122 F.3d 215, 219 (5th cir. 1997), *United States v. Goldstein*, 479 F.2d 1061, 1066 (2nd cir.) cert. denied, 414 U.S. 873, 94 S. Ct. 151, 38 L. Ed. 2d, 113 (1973).

The conclusions and supporting case law is inapplicable simply because as in *Tate*, *Saunders* did not object to the mistrial, he simply requested the court poll the jury to determine what charge the jury was hung on.

The court further opines at [88]:

The only fact that weighs in the defendant's favor is defense counsel's request that the jurors be polled to determine whether they had reached a partial verdict.  This request was not accompanied by an objection to the declaration of a mistrial.

The facts in *Tate* are similar to *Saunders* in that *Tate* did not object to a mistrial.  As in *Saunders*, he stated that it was to no avail to pressure a jury to come up with a verdict.  He just requested they be polled.

13

Our state Supreme Court based their decision in the ruling of *Shelagh Whiteaker v. State of Alaska*, No. 116, Court of Appeals No. A2594. In that case defense counsel objected to discharge of the jury prior to polling.

Our state Supreme Court has created a dispute that requires *Saunders* to make a "*Hobson's choice*", literally to waive one constitutional right to poll the jury to protect another constitutional right to request a mistrial based on coercion or jury replacement. (Parenthetically both mistrial requests were denied.)

Their ruling was also not based on independent and adequate state grounds.  In habeas, if the decision of the last court to which the petitioner presented his claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims and did not clearly and expressly rely on independent and adequate state grounds, a federal court may address the petition. *Michigan v. Long*, 463, U.S. 1032 (1983).

The Connecticut Supreme Court has ruled that *Saunders* acquiesced his constitutional right to poll the jury and in their opinion repeatedly concluded that because *Saunders* didn't expressly object to the trial courts declaration of mistrial that subsequently barred any claim of the double jeopardy.
This conclusion is constitutionally impermissible.

The respondent's suggestion that Saunders further exhaust this claim is consistent with their effort to delay proceedings. A Habeas Court cannot substitute the high court's findings, furthermore if a Habeas Court finds trial counsel was ineffective for not objecting, then what?

The self-defense claims within Saunders' complaint have also been exhausted and any findings of ineffective counsel will simply delay adjudication that has already been found.  Saunders made a sufficiency claim to the Connecticut Supreme Court thus satisfying the presentation

requirement.

A sufficiency claim is that inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt and does not require a court to ask itself whether it believes the evidence established guilt beyond a reasonable doubt instead, the relevant question is whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, *State v. Mulero,* 91 Conn. App. 509-513, 881 A.2d 1039 (2005), cert. denied, 277 Conn. 912, 895 A.2d 792 (2006), OR sufficiency of evidence test criminal procedure. (Blacks Law, seventh edition). A criminal conviction on appeal based on whether enough evidence exists to justify the fact triers finding of guilt beyond a reasonable doubt.

Findings of the Connecticut Supreme Court, *State v. Saunders,* 267 Conn. 363, 838 A.2d 186 (2004), at [21]:

> The defendant first contends that the state failed to disproved his claim of self-defense sec. 53a-19 (elements of self-defense) beyond a reasonable doubt as required by General Statutes 53a-12(a). We disagree.

From page 3 [20] to page 7 [40] the state Supreme Court analyzes *Saunders* self-defense claim and concludes at [40]:

> For all the foregoing reasons the jury was not bound to accept the defendant's claim of self-defense contrary to his contention, therefore, the defendant was not entitled to an acquittal under § 53a-19 as a matter of law.

Of particular interest is the opinion at [33]:

> The defendant essentially contends that, because his claim of self-defense was reasonable, the jury could not have concluded that the state disproved his claim beyond a reasonable doubt.  Contrary to the defendant's contention the relevant inquiry is not

15

whether the jury could have found that the defendant acted in self-defense, but rather whether there is a reasonable view of evidence was sufficient to support the jury finding, **implicit in its verdict, that the state had disproved the defendant's claim of self-defense beyond a reasonable doubt.**

As described in prior text and shown in the jury's verdict at page 33 in binder 2 of 2, how many unanimous not guilty verdicts are required in a single count self-defense case? OR which element of § 53-19 failed in one crime but was acceptable in the other; elements of self-defense (an intentional act) are the same and encompass the entire criminal proceeding.

Connecticut courts have had a full and fair opportunity to address *Saunders'* not guilty verdict.

Finally, the respondent's misconception regarding Saunders' "*Brady* claim" warrants a few extra pages.

The respondent at 13 states that actual innocence claims and *Brady* violations can and very frequently are raised in state habeas petitions.

Saunders agrees and can provide this court with no valid reason why state appointed counsel did not raise any of these claims at trial, supra at 9-12.

Also, at 13:

> The petitioner has failed to demonstrate the inadequacy of state law procedures available to him in post conviction relief.

As stated above, Saunders has filed 81 motions and a federal § 1983 civil rights action trying to obtain exculpatory evidence. There remains no other avenue of relief. Any appeal would at best result in the appeals court to remand for further hearings; the exact same hearing that resulted in orders to provide discovery.

16

Saunders' "*Brady* claim" was identified in his brief as a structural error; prosecutorial suppression of exculpatory evidence.

Saunders already has a unanimous not guilty verdict and further seeks to proceed on the merits of his petition in federal court by way of a miscarriage of justice exception. The gateway claim requires an additional showing that his state trial was not free of non harmless constitutional error.

The respondent's claim that *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196 (1963) is no longer available in post-conviction is without merit.

The respondent's claims that the U.S. Supreme Court's ruling in *The District Attorney Office for the 3rd Judicial District v. Osborn*, 129 S.Ct. 230 (2009) is now controlling in that due process clause does not guarantee the same liberty interest to a criminal defendant proved guilty after trial. Once validly convicted a criminal defendant has been constitutionally deprived of his liberties. The state is not under the same obligation <u>pursuant to *Brady*</u> as it was when the defendant was still presumed innocent. Thus, the court determined that the primary question concerns the adequacy of state procedures to provide post-conviction relief.

In contrast to *Saunders*, *Osborn*'s attack to obtain DNA evidence was a suit under 42 U.S.C. § 1983. *Osborn* brought this § 1983 action without ever using procedure in filing state or federal habeas claims relying on actual innocence at [68]. Unlike *Saunders*, *Osborn* failed to demonstrate the inadequacies of state post-conviction procedures available to him at [69]. At [70] *Osborn* does not dispute that a federal actual innocence claim as opposed to a DNA access claim would be brought in habeas. If such a habeas claim is viable, federal procedural rules permit discovery "for good cause shown". *Bracy v. Gramley,* 520 U.S. 899, 908-09 (1997) Also noteworthy is FN 91 in that Justices Alito, Kennedy and Thomas write:

What respondent has accurately described in his complaint – is a discovery of evidence

that has a material bearing on his conviction. Such a claim falls within 'the core' of

habeas. Recognition of a constitutional right to post-conviction scientific testing of

evidence in possession of the prosecution would represent an expansion of *Brady* and a

broadening of the discovery rights now available to habeas petitioners. We have never

previously held that a state prisoner may seek discovery by means of a § 1983 action

and we should not take that step here. I will hold that the respondent's claim like all other

*Brady* claims should be brought in habeas.

The respondent further adduces her argument by claiming at 13 the 3rd circuit's decision in

*Landano v. Rafferty*, 897 F.2d 661, 675 (1990) is more "factually relevant" to Saunders claim

and concludes: 1) Saunders has not demonstrated that the state habeas proceedings currently

pending are inadequate to protect his rights; 2) Saunders has litigated his *Brady* violations and

is awaiting a decision by the state court; and 3) He has availed himself under discovery

procedures in state court and has further opportunity to litigate any potentially erroneous rulings

on appeal.

As explained in prior text, Saunders relies on a miscarriage of justice exception with an

indisputable unanimous not guilty verdict to the crime in which he pled.  The *Brady* claim is an

integral part of a gateway actual innocence claim to highlight the non-harmless errors that

should allow Saunders to proceed on the merits of his case.

The *Brady* claim as the respondent specifically labels Saunders' attempt to obtain the 911

emergency recording should be considered exhausted.

The application pursuing the "*Brady* claim" in state courts span from pre-trial to appellate.

The Appellate Court in its ruling of April 26, 2007 precluded lower courts from enforcing their

discovery ruling.  The court actually suggests as does this respondent that Saunders proceed to

habeas trial and then address adverse rulings.

This renders state remedies ineffective.

A classic example of Saunders' frustration appears in the respondent's notice to this court regarding access to the original 911 tape #26 at 2: (see herein ATTACHMENT 3)

> The petitioner has repeatedly since [before his first criminal trial] accused the division of criminal justice of tampering with the 911 tapes. Accordingly, because of potential further litigation with regard to that allegation the office of the chief state's attorney believes that it is best that the Danbury fire department retains possession of the tapes until final adjudication.

Saunders had requested this tape since January 27, 1997; it has still not been played in its original format to any trier of fact.  Thirteen years have passed, 9 years after acquittal and a finding of self-defense.

**An additional attempt to exhaust state remedies:**

**<u>Motion to Correct an Illegal Sentence</u>**

Our Supreme Court and Appellate Court have held that C.P.B. § 43-22 is the proper procedural vehicle through which to challenge the validity of an underlying conviction when the sentence allegedly rests on a conviction based on a legally inoperative statute.

Our Supreme Court has also made it clear that the intent of § 43-22 was to expeditiously challenge an illegal sentence prior to a habeas corpus attack which is a "lengthy and time consuming process".

Saunders filed a pro se motion to correct an illegal sentence dated August 6, 2010, received August 9, 2010.  On that same day the state filed a motion to dismiss for lack of subject matter jurisdiction.

Saunders filed a motion for extension to respond received August 18, 2010.  The state's attorney and public defender's faxed a transport order to Enfield C.I. to present Saunders on September 14, 2010.  All that is pending at this point is a motion for extension. Saunders immediately filed an objection to the state's motion to dismiss.  After the hearing, Cobb, J. denied Saunders' motion for articulation and denied his motion to perfect the record for appeal.

Saunders sent a second set of appellate forms to the clerk of Superior Court for certification and waiver of fees. After several weeks, he received an appearance form from the state in the appellate matter at bar.

Saunders called the Superior Court clerk and inquired about certification and waiver of fees. The clerk stated the only requirement was to send the appellant the judgment file which consisted of 2 pages and does not state whether certification and waiver has been granted.

She further stated she sent the original certification to the Appellate Court; however, C.P.B. § 63-3 states: the clerk shall 1) endorse the original appeal form, the date and time of filing and the receipt of waiver of fees; 2) return the original endorsed appeal form to the appellant; and 3) immediately notify the clerk of the original trial court that an appeal has been filed.

It also states this in the upper right hand corner of the form itself.

Saunders wrote to the appellate clerk to determine what course of action is necessary since the original appeal form is already in their possession, as he was unable to provide preliminary statements which are required to be attached. (ATTACHMENT 4)

The clerk simply returned those documents stating they have no appeal bearing that name or number. (ATTACHMENT 5)

At the same time the state sends a copy of their preliminary statement and prior appearance

form bearing the same name and number. (ATTACHMENT 6)

Saunders again writes the Superior Court clerk stating he has no confirmation certification and waiver has been granted. (ATTACHMENT 7)

The clerk responds with a letter stating we inadvertently forgot to send Saunders the original appeal form and now (to save time) she has forwarded it directly to the appellate clerk again precluding Saunders from filing the mandatory appellate claims. (ATTACHMENT 8)

Saunders again has written to the appellate clerk requesting instruction on how to proceed and remains in limbo as of this writing. He has repeatedly attempted to prosecute this appeal since denial in Superior Court but has been effectively precluded from doing so creating further inordinate delay.

<u>CONCLUSION</u>

The actions within this case by state officials should horrify anyone who reads its history.

Saunders, who legally carried a firearm (5-shot revolver) used it first offensively and then defensively to protect his life.

The state's attorney with its unlimited resources subsequently destroyed evidence, withheld evidence and has gone as far as making public statements that he knew to be false.  In one such statement the prosecutor, Warren Murray, claimed in a local newspaper (count 44):

> "This was a shooting of an unarmed man in the back."

In subsequent articles further condemnation of Saunders appeared (prior to jury selection) based on Murray's misstatements.

After a hung jury, to which no one was able to determine what charge the jury was hung despite a request to poll, Murray was able to create an indefensible charge that went unchallenged.

Saunders was found not guilty by way of the elements of self-defense; however, at the direction of the court the jury continued to deliberate until they reached a guilty verdict finding Saunders guilty of the alleged alternative method of committing manslaughter in the first degree with a firearm.

As stated above this remains the only case charged in this manner in Connecticut's history with an upheld conviction.

The sentencing judge remained silent on the unanimous not guilty verdict and claimed the jury rejected Saunders' self-defense claim and sentenced him saying:

> I don't know how the jury came up with this conclusion, but the jury found
> you guilty of manslaughter in the first degree with a firearm and reckless.

He then sentenced Saunders to 27 years to serve in prison.

In the next 9 years Saunders obtained evidence from the public defenders' file that 6 bullets were recovered at the crime scene, 7 bullets can be heard on the 911 tape that was presented to the jury, and the tape presented is out of sequence. He also finds an additional bullet was identified but unaccounted for after the autopsy process.

On the eve of every opportunity to present his findings, injected state-appointed counsel either destroys or fails to present these findings.

Now, in its' brief the respondent for the state claims to this court that Saunders has "availed" himself to discovery and is somehow awaiting adjudication after a full and fair hearing despite evidence in their possession to the contrary and…

…at the same time informs this court that they are not going to make available the original 911 recording, allegedly the same one presented to the jury in 2 trials prosecuting Saunders.

Their reason: "They anticipate further litigation regarding these tapes."

Yet…the respondent claims Saunders is responsible for the inordinate delay.

The record speaks for itself.

The respondent for the state expects this court to dismiss this application and send Saunders on another 13 year exploit which will guarantee the offending parties will be long retired and should put him at the end of a sentence for a crime to which he was found not guilty.

Our state Supreme Court in a "highly unusual move" ordered the release of an inmate on the grounds of a 6th amendment violation. (see ATTACHMENT 9, *Hartford Courant* article dated 11-02-2010, *"Inmate Ordered Released"*)

Specifically, the prosecutor in that case read 5 documents taken from a computer that was seized from the defendant. These documents were authored to assist his defense and ruled to be attorney/client privilege. The documents outline the entire trial strategy; it gave the prosecution an unfair advantage.

In *Saunders* his entire work product case file, state and federal, were subpoenaed and ordered to be relinquished to the prosecution during the first trial that resulted in a mistrial.

The prosecution adjusted accordingly to obtain this unlawful conviction. (see § 2254 brief in complaint at 115, also binder 2 of 2 ATTACHMENT 4, and further explanation and testimony in the post-trial brief attached herein as ATTACHMENT 1 pages 41-46.)

In addition to other claims, Saunders is also entitled to this same relief.

As news agencies report almost on a daily basis, it is becoming acceptable for prosecutors to engage in malfeasance to gain convictions at all costs.

The expectation that reviewing courts will uphold the convictions is seldom disappointed. (see ATTACHMENT 10, *USA Today* article dated 09-23-2010, *"Special Report: Justice in the Balance"*)

23

What continues to occur in Saunders' case cuts to the core and severely undermines the judicial process. Saunders had 2 trial lawyers simultaneously representing him in both criminal trials with in excess of 40 years legal experience, an appellate attorney whose practice is limited to appellate issues, an appointed habeas attorney who maintains the movie *A Few Good Men* was based specifically on him, and now attorney Beck who was inserted into Saunders' case and whose purpose has yet to be determined.[2]

All sworn officers of the court, all of whom never questioned the charging instrument or any aspect of the state's case despite hundreds of letter from Saunders.

There is no other legal or logical conclusion other then the first unanimous not guilty verdict was dispositive of Saunders' case. Saunders is actually innocent.

Attached to this brief is a copy of Saunders' post-trial brief (ATTACHMENT 1).

In addition to the aforementioned defense attorneys, Saunders highlights the state's attorneys misunderstanding of statutory law, their testimony and responsive pleadings to Saunders actual innocence. Can it possibly be a misunderstanding of statutory law?

In this case all attorneys hired by the state cumulatively have in excess of 100 years legal experience both prosecution and defense.

As quoted in Circuit Judge Rosen's dissent in *Landano*, and is appropriate here, at [165]:

> Under the facts established here, there is a grave threat to the fundamental
>
> rights to the personal liberty of an innocent man unless the grant of the writ
>
> of habeas corpus is allowed, to adhere so strictly to a prudential consideration
>
> of comity in the face of such manifest injustice detracts from the judiciary's role
>
> as the guarantors of justice and the great writ's ability to stand as a bulwark of

---

[2] To further complicate and frustrate this matter Saunders was informed on November 10, 2010 that Attorney H. Jeffrey Beck was suspended from practicing law on October 22, 2010.

24

personal liberties.

By the facts stated herein, the petitioner, Randall Saunders objects to the motion to dismiss and respectfully requests this court to <u>deny</u> the respondent's motion and allow Saunders to proceed on the merits of this application.

### <u>How many unanimous not guilty verdicts</u>

### <u>does it take in a single count self-defense case?</u>

Respectfully submitted,

Randall B. Saunders

<u>Note</u>:
*Any further documentation this court should*
*require will be sent forthwith at the request.*

# HABEAS COURT

## OF THE

# STATE OF CONNECTICUT

### CV-06-4000933-S

### RANDALL B. SAUNDERS 253100

### v.

### WARDEN, STATE PRISON

## POST-TRIAL BRIEF
### OF THE PETITIONER

H. Jeffrey Beck, Esq.
*for the petitioner, Randall B. Saunders*
30 FERRY BOULEVARD, UNIT 2
STRATFORD, CT 06615

SEPTEMBER 2010



# CV-06-4000933-S  :  SUPERIOR COURT

SAUNDERS, RANDALL #253100  :  JUDICIAL DISTRICT OF
ROCKVILLE

v.  :

WARDEN, STATE PRISON  :  September 1, 2010

## STATEMENT OF THE CASE

The petitioner, Randall Saunders, was arrested on January 27, 1997 for the shooting

death of Dominic Badaracco. Saunders was charged with murder in violation of C.G.S.

§ 53a-54a (a).

After a mistrial to that charge Saunders was charged in long form information with

manslaughter in the first degree with a firearm in violation of C.G.S. § 53a-55a (1)

fourteen days prior to the commencement of trial.  Substitute long form information was

filed charging Saunders with the crime of manslaughter in the first degree with a firearm

under two subsections § 53a-55a (1) and § 53a-55a (3) intentional and reckless

charged conjunctively (single count information). Saunders entered a plea of

justification.

Saunders was found by unanimous jury verdict not guilty of manslaughter in the first

degree with a firearm under § 53a-55a (1) intentional but was found by written verdict

guilty of "reckless indifference manslaughter first degree".

Saunders contends that subsections of manslaughter in the first degree with a firearm

are not alternative methods of committing manslaughter in the first degree with a firearm

but are statutory alternatives offering 3 separate and distinct crimes.

States attorney, trial counsel, appellate counsel and counsel for the respondent

maintain the crime of manslaughter in the first degree with a firearm is a crime that



2

embodies alternative methods of committing the substantive offense.

Saunders further alleges various claims of prosecutorial impropriety and evidentiary claims that were attacked within the subject trial. A comparison of testimonies and facts of law are stated within.

Saunders maintains that he has been found not guilty by way of unanimous jury verdict and is entitled to immediate release from custody.

Transcripts spanning from motion practice to verdict of these actions have been put in evidence and are referenced throughout his pleadings and in this brief.

On May 13, 2010 trial commenced in this application for a writ of habeas corpus.  The first witness was attorney Lisa Steele, appellate counsel for the petitioner.

Attorney Steele, who is in private practice in Massachusetts, works as a special public defender in both Connecticut and Massachusetts.  She was licensed to practice in Connecticut since 1995; her practice is criminal appeals for indigent clients in both states.

Attorney Steele was assigned in December of 2001 and represented Saunders through the U.S. Supreme Court. All applications for relief have been denied.

In accordance with the allegations set forth in Saunders complaint, Steele was questioned in regard to her understanding of the conjunctive charge of manslaughter in the first degree with a firearm under two subsections § 53a-55a (1) and § 53a-55a (3). Specifically she was asked at page 12, lines 6-10 (May 13, 2010 habeas transcript):

> Q.     What is the difference between those two statutes, subsections of the
>        statute § 53a-55a (1) and § 53a-55a (3)?

To which she replied:



A.  I believe it has to do with the level of intent. Intent versus reckless.

Steele further states in her testimony at page 20 that "It never occurred to me that the subsections are separate offenses rather than alternative ways to charge the same crime."

Also at page 20, "I don't know, we had correspondence talking about the relationship between the two statutes; I don't think it ever occurred to look it up in that way."

Had Steele challenged, with the fact of law that charging two crimes in the alternative renders a charging instrument fatally flawed and buttressed that claim that once self-defense is found it is dispositive of the entire criminal proceeding, it would have required reversal.

It further appears throughout Steele's testimony that she simply did not know that the charging instrument combined with the judges last instruction to the jury to "just decide one" (jury instructions page 154-155) was patently unfair and constitutionally impermissible.

Had Steele challenged, it would have required a finding of justification.

Steele's inaction would be consistent to establish prejudice as described in the appellate review standard in *Bunkley v. Commissioner*, 222 Conn. 444, 610 A.2d 598 (1992) in that to establish prejudice resulting from appellate counsel's deficient performance, the petitioner must establish that as a result of that performance there remains a probability sufficient to undermine confidence in the verdict that resulted on appeal.  Also, the petitioner must establish that he would be entitled to a reversal on appeal and that deficiency raises a probability sufficient to undermine confidence in the verdict.

21

4

The respondent for the state in this matter did not cross examine this witness regarding any aspect of direct testimony; however, a responsive pleading(#182.00) which is an objection to a motion for summary judgment is noteworthy because it clearly states, albeit incorrectly, the position of the state regarding the specific counts and subject matter testified to.

At page 49 (#182.00) the respondent contends:

> In his motion, the petitioner claims his attorney should have objected to this conjunctive charging. Contrary to his assertion however a charging document may properly allege conjunctively in one count several statutory methods of committing a single offense and cites *State v. Wohler*, 231 Conn. 411, 415 (1994).

This statement of law is inapplicable as manslaughter in the first degree with a firearm subsections (1) and (3) are separate offenses each with distinct methods which are comprised of different elements by which each offense may be committed. *State v. Tomlin*, 266 Conn. 608, 835 A.2d 12 (2003)

The respondent also quotes at page 49 Connecticut Practice Book section 36-13 (It may be alleged in single count that...the defendant committed the offense by one or more specified means.)

Connecticut Practice Book § 36-13 clearly states:

> It may be alleged in single count information that the means by which the defendant committed <u>the offense</u> are unknown or that the defendant committed <u>the offense</u> by one or more specified means"

In the subject case the means have never been in dispute. P.B. § 36-13 refers to

**30**

committing <u>an offense</u>.

Specified means to commit this offense are listed in § 53a-3 which are (15) machine

gun (16) rifle (17) shotgun (18) pistol or revolver (19) other weapon in which a shot may

be discharged.

These are alternatives means by which a defendant can commit manslaughter in the

first degree with a firearm.

The respondent further claims at page 49:

> To provide adequate notice to the defendant that the state intends to prove that
>
> <u>the offense</u> was committed in one or more alternative ways, a charging document
>
> must charge in the conjunctive even if a statute is drawn in the disjunctive. (*State*
>
> *v. Wohler*, 231 Conn. @ 415) Thus, where a charging document alleges in the
>
> conjunctive, that <u>an offense</u> has been committed in more than one way, a guilty
>
> finding may stand if the evidence supports conviction based upon any one of the
>
> statutory alternatives.
>
> When a defendant is charged in the conjunctive with two ways of committing
>
> <u>a single offense</u> the state is entitled to a conviction if it had proved beyond a
>
> reasonable doubt either alleged mode of committing that offense.  The state
>
> postscripts (emphasis added).

As stated in prior text, manslaughter in the first degree with a firearm is not a statute

that embodies alternative methods to commit the substantive crime.  The subsections

are <u>separate offenses</u>.

The respondents' case law is subsequently misapplied.

In *State v. Wohler* the defendant was charged with larceny in violation of § 53a-125a as

31

6

defined in § 53a-119 he was charged with alternative ways to commit larceny. Larceny is a crime that embodies alternative methods to commit the <u>single offense</u>. In fact, subsections 1-9 are meant as specific ways to commit the <u>single offense</u> of larceny. Larceny is a specific intent crime with alternative methods requiring the same elements to convict.

    1) The intent to do the act complained of;

    2) the act was done wrongfully;

    3) the act was committed against the owner.

There are at least 9 alternative methods to commit the <u>single offense</u> of larceny.

The respondent further relies at page 49 on the conclusion that: "A guilty finding may stand if the evidence supports conviction based on any one of the statutory alternatives when a defendant is charged in the conjunctive with two ways of committing <u>a single offense</u>."

Once again the subsections of manslaughter in the first degree with a firearm are separate offenses; a crime that does not embody alternative acts to commit one offense.

The prosecutor in both trials of this petitioner was also a witness in this habeas trial. At the time of the prosecution Warren Murray was a state's attorney for 13.5 years. When Murray was questioned regarding the charging instrument and the conjunctive charges stated therein, he states at page 63 (May 14, 2010 habeas trial transcripts): "I charged him with two different ways of committing manslaughter in the first degree with a firearm."

At page 87, lines 9-25:

**32**

Q.      I am showing you petitioner's 31, it is your position that the 2 statutory---or

the two sections of manslaughter, intentional and reckless, are alternative

ways to charge a same crime or are they specific, separate offenses?

A.      I would say that I think they are alternative ways of committing the same

crime.

Q.      And what is your basis for that?

A.      Because one can be committed intentionally, it is possible that the crime

could have been committed intentionally or it is possible that it could have

been committed recklessly.

Q.      And they're not---in your opinion they are not separate offenses?

A.      Under charging law, as I understand it, when you add the word "and" and

charge in the conjunctive that that does make them separate ways of

committing the same offense.

This is a clear misstatement of the law.  There are statutes that embody alternative

methods of committing the substantive offense; however, manslaughter in the first

degree with a firearm is not such an offense.

Assuming arguendo that one can charge these offenses in the conjunctive (which they

cannot), with a plea or recognized defense of self-defense the first unanimous jury

verdict is dispositive of the entire criminal proceeding.

Murray understands this concept. At page 87-88, lines 26-5:

Q.      If the self-defense claim, if the jury has bought it or had found Mr.

Saunders had acted in self-defense would that self-defense claim result in

a not guilty verdict on both counts or both those charges?



8

A.    I believe so.

Q.    Is that your understanding of the law?

A.    Yes.

Saunders had a single defense of justification throughout both trials. The not guilty verdict to manslaughter in the first degree with a firearm was first and unanimous from the jury.

Appellate counsel Steele also correctly concludes at page 41 (May 13, 2010 habeas trial transcript):

Q.    Are the elements for self-defense the same with respect to intentional manslaughter and reckless manslaughter if you know.

A.    I don't know, I assume the elements—I mean the statutory elements are the statutory elements.

Q.    Okay, so your answer is you don't know.

A.    I'm not sure how they would differ.  I'm just looking at the self-defense statute itself which would be § 53a-19. I'm not sure how they differ, you know just in the abstract.  If you've satisfied § 53a-19 you've satisfied § 53a-19.

Saunders was found not guilty by way of the elements of self-defense.  It's textbook law that a jury verdict is the presumption of facts derived from the presentation of the evidence.

Self-defense is an intentional act.  If you find fact 'A' Saunders sole defense was self-defense and once found is dispositive of the case you must reach conclusion 'B' Saunders was found not guilty by way of the elements of self-defense.



9

The genesis of this unlawful conviction lies within Murray's misunderstanding of statutory law at page 87 thinking reckless and intentional manslaughter are alternative acts to commit a single offense.

Further indication of Murray's misunderstanding of statutory law is established within his claim in pre-trial hearings, trial 1, trial 2, post conviction proceedings including this trial at page 73 that: "*State v. Maselli*, 182 Conn. 66, 73, 437 A.2d 836 (1980) and *State v. Knighton*, 7 Conn. App. 223, 508 A.2d 772 (1986) establish case law that permits a jury to acquit on intentional manslaughter and convict on deliberate indifference manslaughter." It should be noted the state Supreme Court has also adopted this misapplication. This determination has gone unchallenged throughout all proceedings in this case. Both *Knighton* and *Maselli* were murder trials, both have reckless and intentional manslaughter as lesser included offenses, both trials were pre-*Sawyer* (acquittal first doctrine adopted in 1994)

In both trials juries were given the reasonable efforts charge which allowed juries to convict on any charge without acquittal on the others (greater or lesser offenses). Juries did not have to communicate as to how they landed on the convicting charge.[1] With the adoption of the acquittal first doctrine these cases are inapposite to the case at bar.

In Saunders the first unanimous verdict is dispositive. If the jury found Saunders self-defense claim failed it would mandate conviction on intentional manslaughter in the first degree with a firearm as self-defense is an intentional act.

As appellate attorney Steele surmised at page 27 that perhaps this was an imperfect self-defense is also misguided. The doctrine of imperfect self-defense is a doctrine of mitigation; simply put unlike our acquittal first process required for a lesser included

---

[1] It should be noted that *Maselli's* jury did not state which subsection they landed on.



offense instruction, under the doctrine of imperfect self-defense a jury must find that the defendant acted with the requisite mental state corresponding to the <u>greater offense</u> before the jury can consider mitigating downward to an offense that is consistent with a less culpable mental state further supporting the inapplicability of *Maselli* and *Knighton*. Another structural error in this action can be found in the "just decide one" jury instruction which was the last instruction prior to verdict at pages154-155:

> I'm going to make it clear regarding the count, the alternative means the state
> has charged or alleged in committing manslaughter, your verdict on either
> alternative must be unanimous.  If you decide on the intent portion it must be
> unanimous.  If you decide on the reckless portion it must be unanimous you do
> not need to clearly decide both of them "just decide one" either intent based on
> your view of the evidence and the law or reckless based on your view of the
> evidence and the law.  "Decide one of them."

These instructions went unchallenged at trial and appellate review.  These instructions just vitiated the defense of self-defense and created a factual dispute not based in evidence or plea of the defendant.

Saunders correctly testifies at page 55, lines 14-25 (May 13, 2010 habeas trial transcripts):

> Well, my understanding, and I'm not an expert in the laws, if you claim self-
> defense its an all or nothing thing, you're either guilty of intentional harm or not
> guilty by way of justification by charging in this manner in my opinion, it vitiates
> the self-defense claim by injecting the separate charge of manslaughter in the
> first degree with a firearm under the reckless section allows a jury to return a



verdict without concurrence of the shooting, which just vitiates self-defense.

There's no more self-defense, pick one hurry up, I've got to get to lunch.  I mean

that's what the jury instruction sounded like.

The judge must give the jury an instruction that is a reasonably clear comprehension of

the issues for its determination under the pleadings and the evidence presented that is

suited to guide it in determination of the issues. *State v. Gooden*, 89 Conn. App. 307,

313, 873 A.2d 243 cert. denied, 275 Conn. 918, 919, 883 A.2d 1249 (2005)

Also,

By instructing on a theory of criminality for which there is no supporting evidence the

court implies there is a factual dispute for the jury to resolve regarding that theory of

criminality. *State v. Campbell*, 225 Conn. 650, 626 A.2d 287 (1993)

This instruction creates just such a dispute.

The question before the jury is: was this a case of manslaughter in the first degree with

a firearm without justifiable excuse or one committed in self-defense?

Appellate Court similarly concluded in *State v. Shultz*, 100 Conn. App. 709, 921 A.2d

595 (2007) that the trial court did not err in refusing the defense request for an

instruction on accidental or unintended consequences because a claim of self-defense

is an admission of intent.  Also, in *State v. Collins*, 100 Conn. App. 833, 919 A.2d 1087

(2007) under a theory of self-defense a criminal defendant basically admits engaging in

the conduct at issue but claims that conduct was legally justified.

The doctrine of stare decisis should be controlling in the findings of this court.  Saunders

is entitled to the unanimous jury verdict of not guilty.

Saunders case is the only case in Connecticut juris prudence since the adoption of the



acquittal first doctrine to be charged, a conviction obtained and upheld.

While it stands the facts of this case will conclude that anyone who claims self-defense in this state should proceed directly to sentencing. A charging instrument accompanied by a "just decide one" instruction will result in conviction 100% of the time.

The record clearly reflects trial counsel, appellate counsel, state's attorney and respondent counsel for the state do not understand this portion of statutory law.

These claims clearly show counsel's performance was deficient and fell far below the norms established in the A.B.A. and these errors prejudiced the petitioner to the extent that deprived Saunders of a fundamentally fair trial. *Strickland v. Washington*, 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984). Also see *Kotteakos et al. v. United States*, 66 S. Ct. 1239, 328 U.S. 750, 90 L.Ed. 1557 (1946) which is on point with improper jury instruction and the federal standard of review: habeas relief for constitutionally significant trial errors is granted only when the error had substantial and injurious effect or influence in determining the jury's verdict.

The "just decide one" instruction is not exclusive in this case regarding injurious instructions.

Jury instructions at page 155, lines 9-15:

> Again with the scenarios with the lesser includes, if you are unanimous not guilty on the first count you consider 2nd degree, you are unanimous not guilty then you consider negligent homicide as to the lesser included.

> "Any guilty verdict ends deliberations immediately."

This too is a misstatement of law that went unchallenged.  In Saunders self-defense case the first verdict guilty or not guilty is dispositive of the entire criminal proceeding.



13

There are no degrees of self-defense and imperfect self-defense is not recognized in Connecticut.

The judge failed to unambiguously instruct the jury that after acquittal you do not continue to deliberate until you reach a "guilty verdict".[2]

If an improper jury instruction is of constitutional magnitude, the burden is on the state to prove harmless beyond a reasonable doubt.

A jury instruction that omits an essential element from the charge constitutes harmless error if the reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the verdict would have been the same absent the error. *State v. Cote*, 286 Conn. 603, 626, 945 A.2d 412 (2008)

The state having repeatedly urged the jury to base its verdict on a theory predicated on a fundamental constitutional error cannot now seriously contend that the errors had no substantial and injurious effect or influence on the verdict.[3]

How many unanimous not guilty verdicts are required?

The additional claims of prosecutorial impropriety stand alone and are well documented within the pleadings and referenced in the record.  The exceptions that should be addressed in this brief are counts 45, 46 and 47.

Count 45 (see pleadings pages 187-205)

The prosecutor, Warren Murray obtained highly prejudicial statements from named

---

[2] The Connecticut Supreme Court noted at [103]: The defendant does not challenge the propriety or any aspect of the trial court's instructions on self-defense.
[3] Harmless error analysis did not apply to jury instruction error that improperly removed the element of specific intent…the only contested issue—from the jury's consideration and in effect commanded a directed verdict for the state. *Neder v. U.S.*, 527 U.S. 1 (1999)



14

witnesses and presented this statement on the day of sentencing.

In this count Murray identified witnesses and the subject matter to which they would be testifying.  The witnesses were Brad and Karen Bauer.  They were identified in March of 1998 (see pleading page 189) and again in December 1999 (page 190).

Their claims were investigated and proven false before both trials.  Both witnesses were Not called in either trial and the subject matter was never brought up in any proceedings One hour before sentencing Murray gives a sworn statement as a full exhibit to the judge.  This statement (pleadings pages 204a-204b) contained the exact same subject matter that was proven false on two separate occasions.  The petitioner was unable to confront these allegations.

A sworn statement is testimonial evidence that is subject to 6th amendment confrontation. In fact in *State v. Stevens*, 278 Conn. 1, 12, 895 A.2d 771 (2006) it's been established that due process requires that a defendant be given the opportunity to contest the evidence upon which the trial court relies for sentencing purposes. Also in *U.S. v. Garcia*, 693 F.2d 412, 415 5th Cir. (1982) where a judge relies on certain information in assessing a sentence the defendant must be given some opportunity to rebut that information.

Over the objection of counsel (see transcripts at pleadings pages 196-204) the court stated, "The court in sentencing will apply whatever weight it intends to apply to all material submitted by counsel on behalf of their respective positions and consider and sentence what the court finds appropriate."

The state had an opportunity to confront all defense witnesses at both trials.  This constitutional right was not afforded to the defense.



When Murray was questioned about these statements he states at page 93 that he recalls putting the statements in, he also recalls they did not testify in either trial and confirms at lines 26-27, "I don't think testimony is taken at a sentencing hearing ordinarily in a sense that you cross examine witnesses."

Count 46 (see pleadings pages 245-262)

The prosecutor, Warren Murray, served on this petitioner's power of attorney a subpoena duces tecum ordering the entire case files containing state and federal work product surrendered to him.

Pleadings pages 247-262 contain the transcripts regarding the issuance of this subpoena duces tecum as well as the "protests" that Murray testifies to at page 95 and the attempts to claim privilege.

Murray's conclusion that Ms. Joy was not part of the "legal team" is misplaced by his own admission at page 97, lines 9-24, "I think anybody that knows the case and anybody that sees the case can see that Ms. Joy managed a lot of the case, so I thought she may have evidence about the case."

Murray requests verbatim in his subpoena what is not discoverable (see pleadings page 246). Also see P.B. § 40-31 at 1... "or any person employed by the defendant in connection with the investigation or defense of the case."

Murray at page 95 stated that he also invited Ms. Joy to present evidence to show the state that this was in fact a self-defense case.

Saunders was represented by counsel at the time of this request.

Ms. Joy was subsequently ordered over the objection of this petitioner to surrender the entire case files of state and federal proceedings to which Murray was either a party or



a defendant. (see transcript at pleadings page 225)

Of particular interest is the description of what Murray did with these case files.

At habeas trial at page 98 (May 14, 2010 transcript):

> I took the 3 boxes home one night[4] and returned them the next day. All of the evidence in the case, virtually every single scrap, was evidence provided to the defense and that's pretty much within those boxes, nothing significant, certainly nothing material that changed my view of the case.

At the trial of February 4, 2000 pleading pages 259-262 at page 260 Murray states:

> I would like to indicate for the record that after 5 o'clock yesterday they (3 boxes) were locked in an evidence closet down in our office and we haven't gone through them. We opened them and started to go through them. They're just too voluminous for me to work with.

Murray's testimony regarding these subpoenaed items deserve consideration as they are profoundly inconsistent especially his new claim that "it had nothing that would change his view of the case."

This subpoena was during the first trial in which Saunders charged with the intentional charge of murder and the lesser included offenses of manslaughter in the first degree with a firearm under § 53a-55a (1) (intentional) and the "catch all" of negligent homicide. Murray has always maintained throughout both trials that this shooting was an intentional act. (See closing arguments T-1 at volume 6, document #37, pages 2-22 and pages 61- 74. Also, see closing arguments T-2 volume 13, document # 70 and #71, pages 2-34 and pages 57-80.) There is not now nor has there ever been a claim of

---

[4] At pleadings page 246 subpoena was served on 2-2-2000. Joy testified at trial and turned over material on 2-3-2000. Murray had to take material home on February 3rd and returned morning of February 4th. (see transcript)



accidental or unintentional shooting in these trials. There has also never been any claim or plea of diminished capacity.

When Murray was questioned about why he charged Saunders with subsection a(3) of manslaughter in the first degree with a firearm, he stated Saunders was under the influence of alcohol.  In fact he states on 13 separate occasions throughout his testimony this alleged fact not based in evidence (at page 66 x 4, at page 67 x 2, at page 68 x 3, at page 69 x1, at page 71 x 2 and page 76 x 1).

Murray also states that he formulated this decision to charge conjunctively after the first trial. (Also, after he obtained the complete case files of the petitioner.) He clearly established in direct examination within this habeas trial that he charged in substitute long form information based on 2 factors: 1) ingestion of alcohol and  2) credibility issues of the petitioner.

1) Ingestion of alcohol

Prior to charging in substitute information, the 2 crimes of manslaughter in the first degree with a firearm reckless and intentional, there was an entire trial with the majority of the same witnesses.

All witnesses stated clearly and unequivocally that Saunders was coherent, cooperative, able to stand, sit, bend over and clearly respond and communicate to officers.  When witnesses were asked directly if Saunders appeared intoxicated they responded "no".

Murray further relies (at page 88) that based on the petitioner's statement that he ingested 4 beers at Uncle Al's and the additional 2 beers at Tortilla Flat Restaurant, for a total of 6 beers was an important factor in his charging



recklessness.

The facts in these trials are that the ingestion of alcohol that Murray based his charge on occurs between the hours of 6 p.m. and 11 p.m. If you look at the pleading page 57 it is the state's exhibit which portrays Saunders' hat and 6th beer; that beer appears to be ¾ full.  It is a reasonable conclusion that 5 beers in as many hours with sworn testimony of Saunders eating at two different buffets throughout the evening and Saunders weight of 230 pounds, there is no evidence of intoxication.

Also it should be mentioned that Murray formulated another factor relevant in this review: "anger". After Murray reviewed the pending actions in Saunders subpoenaed files he states in his closing arguments at volume 6, document 37, page 18: "The motive in this case is anger." Also, at page 20: "His belief that Dominic was going to shoot him was nothing more then an angry alcohol influenced, poorly reasoned, statistically unlikely guess." All references to intoxication are not based in evidence.

The "angry" theory amounts to additional testimony not based in fact.  State witness Paula Keeler who was in the kitchen on the phone before the shooting T-1 at page 79, lines 3-6 states: "I asked him (Saunders) if he'd been shot or if he needed an ambulance and he smiled and said 'no'."

At T-2, page 16, lines 18-19:

Q.     What was his demeanor before the shooting?

A.     He was really calm and relaxed even.

Deposition testimony, volume 8, document #53, page 20, lines 7-11:



Q.    What was his appearance at that point in time, were his clothes ripped?

A.    No, I didn't notice any rips he just had blood on his face, he was extremely

calm, smiling at me when I talked to him.

State witness Bethany McKnight also claimed to be in the kitchen before the

shooting.

T-1 at page 112, lines 9-12:

So I think I said get an ambulance I think, have you been shot, he just

smiled and said no and that was it.

At page 115, lines 22-24:

He was just so calm I didn't realize that was the guy with the gun.

At page 116, lines 8-9:

He was just as calm as a cucumber.

Also in pleadings pages 71-99 specifically on state's exhibit 69 at call #5, you can

hear Saunders pleading with the decedent, "C'mon Dominic you have to stop it."

2) <u>Credibility issues</u>

Murray claims at page 82 that he charged conjunctively after the first trial

because Saunders claimed he was a lieutenant in the Marine Corp, a primary

marksmanship instructor and he knows the laws of self-defense and that his

assessment of Saunders credibility had "major issues".

These claims were proven false within the first trial and have no bearing on a

self-defense claim.

Murray's testimony of his charging documents are not only unlawful and fatally

flawed but are not based in fact.



A reasonable conclusion is Murray had to obtain a conviction in this action to prevent redress in the federal complaint that was filed in U.S. District court in 1999 alleging his tampering with physical evidence. These allegations also appear in the subject habeas action as well as the pending action before the U.S. District Court, 3:10CV410 (MRK).

## Count 47

Prosecutor Murray displayed his unsworn testimony for the exclusive view of the jury. This claim is undisputed by Murray in habeas testimony and can be seen within his closing arguments.

At page 4, lines 4-14 and lines 19-22 Murray stated:

> I've written down some of my thoughts so that you can see them. As I speak them just to help out, some of these thoughts I have are propositions of law and there are about 10 of them, about 10 or 12 sentences which are propositions of law and I want to get them out of my way early so you can them in your mind and think about them later.

The respondent did not cross examine Murray on this count but in her responsive pleading #182.00 at page 106 she claims there is no prohibition against the use of visual aids during closing arguments and quotes our Supreme Court in *State v. Skakel*, 276 Conn. 633, 767, 888 A.2d 985 (2006):

> Counsel is entitled to considerable leeway in deciding how best to highlight or to underscore the facts for which there is adequate support in the record. We therefore have never categorically barred counsels' uses of such rhetorical devices, be they linguistic or in the form of visual aids, as long as there is no



reasonable likelihood that the particular device employed will confuse the jury or otherwise prejudice the opposing party.  Indeed to our knowledge, no court has erected a per se bar to the use of visual aids by counsel during closing arguments, on the contrary, the use of such aids is a matter entrusted to the sound discretion of the trial court.

Saunders agrees there is no prohibition against visual aids with the exception Murray's thoughts and propositions of law are not in evidence and amount to unsworn testimony. Murray's thoughts and prepositions of law have been consistently incorrect throughout these subject proceedings.

Is there a reasonable probability that Murray's thoughts were formulated to convict Saunders with this unfair advantage?

The U.S. Supreme Court has addressed the issue of whether a courtroom situation is inherently or actually prejudicial only with respect to "state sponsored conduct".

*Holbrook v. Flynn*, 475 U.S. 560 (1986), *Estelle v. Williams*, 425 U.S. 501 (1976)

In *Holbrook* and *Estelle*, the high court held a courtroom situation is inherently prejudicial when there is an "unacceptable risk" of impermissible factors coming into play thus violating the defendant's 6th amendment right to have his guilt determined by an impartial jury on the evidence presented.

The respondent addressed some of the further claims of impropriety[5] by putting into evidence the trial courts memorandum of decision dated May 21, 2001(respondent's A). Within that decision the court determines Murray's closing arguments were within acceptable standards using the controlling case law of *State v. Singh*, 59 Conn. App. 638, 647, 757 A.2d 1175 (2000) cert. granted 255 Conn. 935, 767 A.2d 1214 (2001).

---

[5] See counts 39-43.

**47**

The trial court however did find Murray's comments in closing arguments were "troubling, ill advised and inartfully phrased".  The court further found Murray improperly gave his personal opinion on numerous occasions throughout his closing and rebuttal arguments.

*State v. Singh* was subsequently overturned by the Connecticut Supreme Court finding misconduct; *State v. Singh*, 259 Conn. 693, 793 A.2d 226 (2002).

As stated in appellate attorney Steele's testimony in this trial, "other courts have followed."

In Saunders claims of ineffective assistance of trial counsel he testified to evidentiary allegations.

One of these allegations, specifically count 12 which alleges trial counsel failed to make obvious and meritorious objections to evidence known as states 69, which is the emergency 911 emergency transmissions.

Saunders concluded in his testimony at pages 67-73:

1) Calls received cannot be in order presented.

   A) There was only one gunfight in which Mr. Badaracco perished.  Five seconds into the tape presented as State's 69 you can hear 7 shots in 2 seconds. (pleadings page 98)

   B) <u>After</u> those shots you can hear Badaracco enter the kitchen yelling "I don't have to take this f****** shit."

   C) Paula Keeler who is the caller in call #1 says to the 911 operator "I'm in the kitchen I can't tell what's going on." However, if she was in the kitchen on the



only phone in the kitchen she would have been between Saunders and Badaracco, directly in the line of fire.

D)  State's 69 has the decedent in the kitchen *before* Saunders.

Bethany McKnight who was in the kitchen with Keeler testified in both trials that you can hear her say "Oh my God, oh my God" as she saw Saunders entering the kitchen.

You can hear the shooting <u>prior</u> to Saunders entering the kitchen.

It should be noted that in the response pleading of the state #182.00 at page 37 regarding this tape's analyzation the respondent omits what is actually written. The respondent states:

> "In support of his motion he merely points to his exhibit pages 98-99. Those pages contain an e-mail dated October 27, 2006 from an individual named Jon Russell who purports to have analyzed the 911 records. He claims that he examined the 'area on the tape prior to the 911 operator taking the call and forwarding it to police.' He then reports five 'hits' with room ambience". The petitioner leaps to the conclusion that these represent seven shot in two seconds. At no point in the email does Russell make such a finding.

Mr. Russell's email is on pleadings page 98. In that analyzation he clearly states:

> After loading into our digital work station I was able to amplify the overall volume of the tape. Then I went in and identified any audio which would resemble that of a <u>gunshot</u>. My focus was in the area of the tape prior to



the 911 operator taking the call and forwarding it to police.

The respondent omitted that portion of Russell's analyzation and misrepresents to the court that Russell made no such finding.

E)  In call #5 the caller is Susan Bruemmer.  This caller is standing over the body of Badaracco after he's been shot. This call is made at 23:17 (pleadings pages 83). Bruemmer is calm and polite asking "Is there an ambulance on the way? Thank you."

In the background of this call you can hear Saunders pleading with Badaracco, "C'mon Dominic you have to stop it". This call is a full 4 minutes after Badaracco is shot (23:13), unconscious and unable to speak.

Also noteworthy and relevant is the police 911 operator callback.  This call back tape was supplied by respondent (Sulik). In this call back Susan Bruemmer answers the phone at 23:15:49. Bruemmer is on the only phone in the kitchen.  She is literally in the same location as call #5 over the body of Badaracco.  Bruemmer is vulgar and extremely panicked repeatedly yelling "just send the f****** ambulance".

This callback is 2 minutes <u>before</u> what was presented as call #5 in which Bruemmer politely asks "Is there an ambulance on its way. Thank you." And Saunders in the background pleading with Badaracco "C'mon Dominic you have to stop it."

The tape submitted as State's 69 went unchallenged.  It should also be noted that the original 911 tape #26 has never been played in its original format to any trier of fact and its authenticity remains in dispute.  The conclusions alleged by Saunders and facts



supporting his testimony are clearly within the pleadings and record supplied to this court.

The issues above do not require expert testimony.  The questions presented do not go beyond the field of ordinary knowledge and experience of a Superior Court judge. Expert testimony in the findings that trial counsel was ineffective for not challenging the state's tape is also unnecessary, "not every petitioner claiming ineffective assistance of counsel need present expert testimony because some medical and other professional malpractice cases the acts complained of will be such that the triers of fact will be able to determine whether there has been ineffective assistance of counsel without the need of expert testimony. *State v. Carter*, 56 Wash. App. 217, 228, 783 P.2d 589 (1989). Saunders testified to the additional claim at page 73 regarding the number of bullet and bullet fragments recovered during the autopsy process.

In pleadings pages 101-113 are copies of correspondence referred to in testimony at page 73.  At trials 1 and 2 Dr. Edward McDonough testified to the photos supplied and x-rays.  Also to the fact that two bullets and one fragment (photo 17 at page 105) are the same 3 pieces that were removed by him in the x-ray photo (photo 18 at page 105). On pleadings page 110 is an x-ray and photo 13 of 18 supplied by chief medical examiner.  It clearly shows a single bullet or fragment by itself on the other side of the body.  Clearly not within the cluster of 3 testified to by Dr. McDonough who performed the autopsy.

The respondent in her responsive pleadings #182.00 at pages 42-43 state the position of the state within regarding this claim: "The petitioner's assumes that the photograph and x-ray of the fragment were taken from the same angle."



Pleadings at page 112 are a photo of the two separate fragments.  Clearly they are not the same and are on separate sides of the body.  The fourth fragment is unaccounted for.

Trial counsel never challenged these findings by Dr. McDonough.  The conclusion that 3 pieces were received and 4 are documented certainly fall within the materiality standard as Saunders had 5 bullets that were already allegedly accounted for.

Saunders made further claims regarding the recovery of bullets at page 62.

Saunders alleged and testified to the fact that Roger Brooks photographed and collected 6 bullets.

The petitioner presented Detective Brooks with photographic evidence (petitioner's 21-27B) as well as the evidence log (petitioner's 28).  Brooks testifies that all or most of the evidence log was prepared by him.  At page 11 and at page 25 Brooks testifies that he took all the photographs at the scene.

Brooks is specifically asked about the projectile that appears in petitioner's 26-27B.  Brooks replied at page 28 that he was trying to determine whether 21 and 26 were the same round.  He further comments that 26 was identified as a projectile near the clothing of the victim.

This projectile or item of evidence has never been documented but it was photographed.  At page 30 Brooks decides that it's not a round at all.  When asked why was it photographed he stated at page 30, "Crime scene unit photographs anything and everything.  If it becomes significant it appears on a sketch or in a report or a log."

Brooks testifies that the crime scene was "modified" by way of him calling the emergency workers back to clean up the medical debris and further concludes this



round is now a "rivet"[6]

That item was left by medical crews.  The photo in which it appears is after medical

crews cleaned up or "modified" the crime scene.  Detective Brooks also concludes this

item is cylindrical and not deformed in any way.  The court in finding fact should

compare petitioner's 21 and 26-27B.  Both are cylindrical with the exception of impact

damage to the tip.

When Brooks was asked to produce a sequential array of all the photos taken that night,

he was unable to comply.

Brooks further erroneously stated at page 46 that nothing was moved prior to his

processing the crime scene with the exception that the ambulance personnel or fire

fighter 'moved" the round from the floor to the counter.

The first call for assistance was at 23:13, "man with a gun" call, officers Lalli and Bishop

who were at police headquarters respond to call (volume 4, document #29 at page

154). Lalli and Bishop arrive at 23: 15, shift supervisor sergeant Mattei arrived

"moments" later (at page 154). Mattei claims (volume 13, document 68 at page 137):

"When I initially walked in the kitchen area two officers had the suspect in custody.  I

told them to maintain their positions with him. I went into the kitchen, further into the

kitchen area, inspected the scene.  I had one of the officers, officer Emicke, I instructed

him to gather witnesses together in one area for questioning, so officer Emicke was

instructed to take care of witnesses.  I also instructed officer Emicke to place <u>cups</u> over

the spent <u>slugs</u> that had been found so they wouldn't be disturbed.

---

[6] Detective Brooks has now determined after 13 years that this item is a rivet from a pot or pan.  Compared to the
6x6 inch tile, it must have been a giant pot or pan.  It also became unaccounted for.



28

At page 138 Mattei:

Q.    How many slugs did you see?

A.    Two spent slugs.

Q.    Where were they?

A.    One slug was approximately 4 feet from the victim (petitioner's 21) and the other

was on the counter in the cooler area I guess would be the best way to describe

it. (petitioner's 22)

Same bullets described by officers prior to emergency personnel entering.

Officer Lalli at volume 4, document 29, page 154:

I observed what appeared to be a bullet east of where the victim was lying on the

floor.  It was 6-8 feet east of victim's head (petitioner's 21).

Officer Bishop at volume 13, document 67 at page 6 observed someone place cup over

bullet, Badaracco's head toward refrigeration unit.

Two additional bullets and a fragment were removed from the body of Badaracco which

appear in petitioner's exhibit 24-25.

One additional bullet was discovered the next day by Brooks and Emicke which is

petitioner's 23.

Saunders legally carried a 5-shot revolver the night of the shooting.  All 5 rounds were

accounted for prior to emergency workers being allowed to enter scene and attend to

victim.

Emergency workers arrive

Lt. Hottes, volume 11 document #64 at page 55: "At 11:14 (23:14) we got the call." "We

went behind ambulance crew."



Fire fighter Pollard, volume 11, document #64 at page 65 was the first to attend to

Badaracco noticed one bullet (petitioner's 21) by his head and further states: "There

was one more that I noticed when we cut the clothes off and rolled him to look for exit

wounds.  There was a bullet in his clothing what I did was there was a police officer

behind me, I got his attention and I said I'm picking this up and I'm putting in on the

counter because I know how they are about evidence.  I just wanted to make it known to

him what I did with this bullet and when we rolled him over I saw a third bullet peeking

out through an opening in his skin in his back."

Fire fighter Pollard was in A-1 ambulance.  They were dispatched at 23:16 (11:16 pm).

They stayed up the road until called by police at 23:19 (11:19 pm) and was let into

patient at 23:23 (11:23 pm) a full 8 minutes after Saunders bullets were identified: the

bullet that was on the counter (petitioner's 22) cannot be the one described by Pollard.

(see pleading pages 47-49)

Office Lalli, volume 10, document #62 at pages 62-63:

Q.     Were there any fire or medical personnel in the kitchen?

A.     Yes, <u>after</u> we got Mr. Saunders into custody, there was a door leading

       from the kitchen out to the parking area right behind the area that Mr.

       Saunders was in and there were fire personnel on the outside of that

       doorway which is a screen door and we told them that they could <u>now</u>

       enter the kitchen and tend to the victim and they did.  There was a number

       of fore personnel that came into the kitchen <u>at that time</u> to attend to the

       victim.

No officer ever testified to witnessing Pollard put a bullet from the victim to any counter



and that bullet's whereabouts is still unaccounted for.

Brooks' statements that "he doubts anything was moved prior to video taping" at page 46 is inconsistent with prior testimony. (see pleading pages 29-33 which are sworn transcripts, volume 11, document #63)

Brooks took initial photographs and left the crime scene to obtain additional evidence. Officers Emicke and Sturdevant were left at crime scene to "preserve the integrity of the crime scene". The entire restaurant was cleaned under their watch.

Brooks, volume 11, document #63, pages 72-73, upon his return 2 hours later:

Q.    Surprise to you when you saw the condition of the bar when you came to take this video?

A.    I would have expected it to be different.

Q.    And you don't see a single glass of beer, you don't see a single setup you don't see an ashtray is that correct?

A.    Yes, sir.

Q.    Did you authorize the restaurant and bar to be cleaned up?

A.    No, sir.

Q.    It would've been poor police procedure for anyone to have authorized the bar to have been cleaned prior to your arrival, you are the evidence technician.

A.    After the incident yes, I was would consider that something that should not have been done.

Q.    Now, none of the tables has anything on it either do they?

A.    That's correct, I'm sorry.



Q.     No drinks, no plants, no ashtrays, no cigarettes, no nothing.

A.     Correct.

Q.     Except one table, I notice the table with the hat on it.

A.     Yes, sir.

Q.     And was that the cowboy hat belonging to Randall Saunders?

A.     I believe so, yes.

Q.     And there's a single bottle of beer next to the hat correct?

A.     Yes, sir.

Not only was the entire crime scene cleaned up or "modified" but Saunders hat was

testified to by John Ziolkowski, state's witness in both trials, volume 10, document #61

at page 156, lines 4-9:

A.  At that time, somebody had said he was in the kitchen and there was a --- he

    had his cowboy hat on and it was laying on the floor over there after this thing

    broke up.  I had picked up the hat and brought it into him in the kitchen and

    told him to take his hat and his gun and get out of there.

To make the obvious explicit, if Saunders hat could be moved freely from the kitchen

and staged (modified) on a table with the only beer or drink for that matter visible in the

entire restaurant there stands a reasonable probability that the unaccounted for

evidence could also have been removed.  Furthermore, the majority of the state's

witnesses that were with Badaracco stated he was out since before noon at various

restaurants and bars eating and drinking.  He presented at Danbury hospital as "John

Doe" with no personal belongings, no pocket change, jewelry, money…nothing.

The state also presented 4 witnesses, Ziolkowski, Sauli, Bruemmer and Hewes, all of



which claimed in sworn testimony (see pleadings pages 34-40) that they were with Badaracco in the time frame of 1 minutes and held him, comforted him and kicked him, but not one sees the other.

Also noteworthy is Brooks never performed a gunshot residue test on the hands of Badaracco further destroying exculpatory evidence.

Saunders presented testimony within the pleadings that reflect the record that was filed with the court pursuant to P.B. § 23-36 and is a full exhibit. It should also be mentioned that Saunders filed a motion (#125.00, July 2006) for a clerk to clerk transfer of both entire trials including exhibits. This motion remains unanswered.

Saunders maintains that more than 5 bullets were fired and collected within the crime scene and presents audio, photographic and sworn testimony concluding these allegations.

Officer Charles Emicke was also called as a witness and asked questions regarding his actions within the crime scene.  Emicke was referred to in the majority of police witnesses testimony as an integral part of the crime scene preservation and locating and preserving evidence. (see pleadings pages 41-46, count 11)

Emicke was unable to verify any of the claims of officer's testimony.  Emicke testifies at page 54 (May 14, 2010 habeas trial transcript) that he did not take any statements, he didn't make any reports, didn't cover any bullets with cups and there was nobody that he remembers over the body on the decedent that he escorted and interviewed.  This person remains unknown to Saunders.

Had trial counsel called this key witness, it would have severely undermined the testimony of police witnesses who implicated Emicke in key roles. Emicke was also one



of the officers left at crime scene to preserve evidence.  This is when the entire establishment was cleaned up or "modified".

The allegations within Saunders complaint present interesting review standards.

The jury found Saunders not guilty by unanimous verdict.  They continued to deliberate at the direction of the court that "any guilty verdict ends deliberations immediately".  This jury verdict of guilty to the separate crime of manslaughter in the first degree with a firearm reckless subsection  a(3) resulted from a jury instruction that removed the element of specific intent which requires per se reversal (Neder v. U.S., supra).

The evidentiary claims of prosecutorial suppression of exculpatory evidence (911 tape, bullets recovered at autopsy, bullet recovered at crime scene) also require per se reversal.  The evidence at bar is "material evidence".

The state's position was that Saunders shot an unarmed man in the back.  Had trial counsel challenged the state's theories either by way of demanding this evidence be produced or challenging the exclusion of this in front of the jury.  There is a reasonable probability that the outcome of the trial would have been different or does the outcome need to be different? As stated above Saunders was found not guilty by way of unanimous jury verdict for the crime in which he plead justification.

The judge's instructions, previously quoted on pages 11 & 13, clearly had a substantial and injurious influence in determining the jury's verdict.  These instructions also went unchallenged by trial counsel and appellate counsel.

As Justice Rutledge concluded in his most self-conscious statement of the standard in Kotteakos, [7] supra:

>  If when all is said and done, the conviction is sure that the error did not influence

---

[7] See O'Neal v. McAninch, 513 U.S. 432, 437-38 (1995) quoting passage of Kotteakos above.



the jury or had but very slight effect, the verdict and judgment should stand…But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.

Saunders is entitled to the requested relief.  The principle purpose of the writ of habeas corpus is to serve as a bulwark against convictions that violate fundamental fairness. The court's jurisdiction is pursuant to C.G.S. § 52-466.  A Connecticut Habeas Court has subject matter jurisdiction only over cases brought by a petitioner, who is legally confined or deprived of his liberty under the challenged conviction.

Respectfully submitted,

_____
H. Jeffrey Beck, Esq., *for the petitioner, Randall B. Saunders*

## CERTIFICATE OF SERVICE

On _____ I served the post trial brief within by depositing a true copy thereof in a postage prepaid envelope in a depository within the exclusive care of the United States Postal Service addressed to all parties of record.

_____

H. Jeffrey Beck, Esq. *for the petitioner, Randall B. Saunders*
30 Ferry Boulevard
Unit 2
Stratford, CT 06615

Honorable John J. Nazzaro
Superior Court
120 School Street
Danielson, CT 06239

Jo Anne Sulik, Esq.
300 Corporate Place
Rocky Hill, CT 06067

Randall B. Saunders
P.O. Box 1500
Enfield, CT 06082



DOCUMENT #13

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

RANDALL B. SAUNDERS                    :                    3:10CV410 (MRK)

       V.                                              :

COMMISSIONER,                          :
DEPARTMENT OF CORRECTION       :                    AUGUST 6, 2010

## PETITIONER'S REPLY TO RESPONDENT'S CLAIM
## IN ITS OBJECTION TO PRESERVE RELEVANT EVIDENCE

The petitioner in this habeas action respectfully replies to the 5 claims the respondent

makes objecting to the preservation of emergency 911 transmissions known as tape 26.

The petitioner seeks a preservation order to prevent disposal of exculpatory evidence in

pending actions.

The respondent at [1]: The state's habeas has concluded and the court has ordered

post trial briefs and findings of fact.

While the statement at [1] is a fact, the court has ordered post trial briefs of facts

established at trial; this reply is to inform the court that attorney H. Jeffrey Beck has

intentionally precluded adjudication on all allegations concerning 911tapes presented

for trial. In addition to the claims specifically addressing Beck's actions representing the

state habeas[1], attached as EXHIBIT A are the letters to Beck specifically instructing

him whom to call as the expert on the 911 tape issue. Jon Russell from Presence

Studios is the engineer who made all the work product tapes that are within

attachment 1 of the respondent's motion.

Attached as EXHIBIT B is Beck's attempt to file an Ander's brief 3 days before trial

blindsiding this petitioner.  It was subsequently denied.

---

[1] See ATTACHMENTS 21-25 in Binder 2 of 2 and pages 115-116 in Binder 1 of 2 within the brief to excuse
exhaustion requirement.

62



Beck went to trial completely unprepared and was literally ripping pages out of the pleadings and putting them into evidence.

Beck subpoenaed attorney Warren Murray who was the state's attorney for the prosecution, but failed to address Count 34 regarding the 911 tape or any claims concerning the additional bullets alleged in Counts 35, 36 and 37. (Also see ATTACHMENT 43 in Binder 2 of 2)

Attorney Beck was also requested to subpoena at least one of the trial attorneys who represented this petitioner in the state trial and he was given typewritten questions with exhibits to present.  Beck didn't call any trial counsel as a witness in the state habeas trial.  Thirty-one counts out of 58 were ineffective assistance of trial counsel claims, 4 counts concern the 911 tape.

A full and fair hearing with the original 911 tape #26 still has not occurred despite over 29 specific requests, and state appointed habeas counsel has again successfully precluded any adjudication on these claims.

The respondent at [3]: The state claims "the petitioner claims he is actually innocent and has raised identical claims pending in state court."

The petitioner of these actions maintains that he is actually innocent and as a matter of law by the admission of the state's attorney at pgs 87-88, lines 26-5 (May 14, 2010 habeas trial transcript) he was found not guilty.

> Q.    The defense claims that the jury had bought it or found Mr. Saunders
>        acted in self-defense would that self-defense claim result in a not guilty
>        verdict on both those charges?
>
> A.    I believe so.
>
> Q.    Is that your understanding of the law?
>
> A.    Yes.

**63**



Also see page 33 in Binder 2 of 2 which is the verdict.

The claims regarding bullet recovery and 911 tape claims have not been adjudicated rendering the statement at [3] misleading.

At [4] and [5] the City of Danbury is in possession of the state's E-911 tape that was used in the prosecution of this petitioner. The petitioner has questioned the authenticity of this tape before any trial in state court and has a 6th amendment right to confront that tape.  It has been 13 years and that tape or allegations regarding that tape have never been addressed.

In Binder 1 of 2 at page 122 this petitioner clearly stated, "Beck has a long history of not prosecuting cases, and the predicted result is another application of the state's defense: inordinate delay; another habeas counsel will take years."

The petitioner respectfully requests this court to preserve tape #26 for the duration of federal proceedings as trial counsel failed to address any allegations regarding the 911 tape admitted into evidence against this petitioner.

As a common sense approach, if this tape was authentic, it would have been played in its original format years ago, and as stated in respondent's attachment [4] at 73, lines 5-6, "as long as there is breathe in my body, I'll get that tape and play it to a finder of fact."

Respectfully submitted,

Randall B. Saunders



③